U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 APR 17  PM 2: 24

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )    Case No. 5:13-cr-54-4 |
| | ) |
| CHARLES HERCULES | ) |

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND DEFENDANT'S SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE AND STATEMENTS
(Docs. 78 & 80)

This matter came before the court on January 8 and February 27, 2014 for an evidentiary hearing on the motions to suppress evidence and statements filed by Defendant Charles Hercules (Docs. 78 & 80). Defendant alleges that his constitutional rights were violated when he was subjected to custodial interrogation after he had invoked his right to remain silent and requested an attorney. He seeks suppression of all of the evidence derived from these alleged violations, including evidence gleaned from the search of his cell phone.

The government opposes Defendant's motions, contending that his invocation of his right to counsel was ambiguous, as was his invocation of the right to remain silent. The government further argues that the search of Defendant's cell phone was consensual and that Defendant voluntarily provided a DEA agent with the password for his phone to enable the search.

The parties completed their post-hearing briefing on March 13, 2014, at which point the court took the matters under advisement.

Defendant is charged in a one count superseding indictment with conspiracy to distribute 100 grams or more of heroin in the District of Vermont and elsewhere.

The government is represented by Assistant United States Attorney Craig S. Nolan. Defendant is represented by David J. Williams, Esq.

## I.    Findings of Fact.

In August of 2012, the DEA was investigating the source of heroin contained in bags branded with the word "Flow" which was being distributed in the Rutland, Vermont area.  DEA Agent Thomas Doud believed Flow heroin was responsible for the August 29, 2012 overdose death of a young man in Rutland.

On July 29, 2013, the DEA, the FBI, and local law enforcement coordinated a joint effort to secure Defendant's cooperation in their investigation of the source of Flow heroin.  Their plan was to arrest Defendant in New York on an outstanding warrant arising from the July 24, 2012 initial indictment in this case and determine whether he was willing to provide law enforcement with information regarding the source of Flow heroin, which the agents believed was located in the Bronx, New York.  At the time, Defendant was twenty-one years old and had been arrested when he was twenty and jailed for four days.  During this prior incident, he was neither questioned nor provided with *Miranda* warnings.  Defendant is a high school graduate with no difficulty understanding English and with some employment history.  During the court's hearing, Defendant's testimony was fully intelligible with an unremarkable tone of voice, vocabulary, and diction.

In the early afternoon of July 29, 2013, DEA Agent Thomas Doud, DEA Agent William Kivlehan, and a local police officer went to Defendant's home in Woodbury, New York and spoke with Defendant's mother.  Using a ruse that evidence regarding prescriptions in Defendant's name was involved in one of their investigations, the agents told Defendant's mother they would like to ask Defendant about his prescriptions.  Defendant's mother told the agents that Defendant was at a training/certification class for security guards and that she believed the school had the name "Finch" in it.  She also provided a general description of the school's location.  At the Woodbury police department, the agents researched this information and determined the school was likely the Damon Finch Power Sessions school located on Route 94 in nearby New Windsor, New York.  They proceeded to that location and arrived at the school shortly after 4:00 p.m.

2

At the Finch school, DEA Agent Thomas Doud was joined by DEA Task Force Agent Daniel Merchand, Vermont State Police ("VSP") Detective Casey Daniell, DEA Special Agent Tim Hoffman, and FBI Agent Christopher Destito (all of whom were based in Vermont).  DEA Agent William Kivlehan (who was based in New York) had also travelled to the school to assist in Defendant's arrest.  The agents were dressed in plain clothes and arrived in several vehicles.  The school was located in an upstairs corner section of a multi-unit building that housed various businesses.  The agents assumed positions around the building in order to monitor the exits.

Agent Destito went upstairs in the building to look into Defendant's classroom. Damon Finch, who was administering a test to Defendant's class, asked if he needed some help.  Agent Destito told him he was waiting to pick up his friend after the class. When Mr. Finch asked who the friend was, Agent Destito did not answer him and left the classroom area.  Mr. Finch told the class that something seemed "fishy" (Tr. 2/27/14 at 72:2) because someone just poked their head in the classroom and asked when it would end because he was there to pick someone up.  Thereafter, Mr. Finch came out of the building, into the parking lot, and looked around.  He encountered Agent Kivlehan, who asked him for identification.  In response, Mr. Finch asked Agent Kivlehan for his identification.  Agent Kivlehan told Mr. Finch that he was a federal agent involved in an investigation, showed him his credentials, and asked him if there was student named Charles Hercules in his class.  Mr. Finch answered in the affirmative and offered to go up and get Defendant who was taking a test.  Agent Kivlehan advised Mr. Finch that they did not want to disrupt his class and that they would wait for it to end.  Mr. Finch showed Agent Kivlehan his license and expressed concern that the agents were state auditors seeking to audit his business.

Mr. Finch returned to the classroom and told his students that if they ever got pulled over or questioned by a police officer, they should exercise their right to a lawyer. At the end of the class, Mr. Finch provided Defendant with the business card for a

criminal defense law firm Cobb & Cobb located in Newburgh, New York.[1] As the students left the building by walking down a staircase to a rear exit that led to the complex's parking lot, Agent Kivlehan and Agent Doud waited on either side of this exit for Defendant, while other agents monitored the building's front entrance. After Defendant descended the staircase and exited the building, Agent Kivlehan and Agent Doud, one on either side of Defendant, told Defendant he was under arrest and grabbed his arms. At this point, the accounts of what happened in the course of Defendant's arrest sharply diverge. Before examining those conflicts, it bears noting that certain facts are undisputed. It is undisputed that shortly after he encountered the agents outside the Finch school, Defendant told the agents, "I don't have to talk to you." (Tr. 2/27/14 at 17:14.) It is also undisputed that, after his arrest, Defendant was transported in a vehicle to a nearby shopping area where he was questioned at some length, that Defendant was given *Miranda* warnings in the course of this questioning, and that, at some point, Defendant provided Agent Doud with the business card for the Cobb & Cobb criminal defense firm which he obtained from Mr. Finch.

With regard to the circumstances surrounding his arrest, Defendant testified that, after the class, he descended the staircase and, in the course of doing so, he began texting his fiancée that he thought he was about to be arrested. He based this suspicion upon his teacher's shaking his hand and placing the business card for a criminal defense firm in his hand as he did so and because through the window above the staircase Defendant saw "a few middle-aged gentlemen standing outside." (Tr. 2/27/14 at 77:7-8.) As Defendant

---

[1] Damon Finch did not testify at the court's hearing. Both parties claimed to have interviewed Mr. Finch, who allegedly provided conflicting information regarding how Defendant came to be in possession of a business card for a criminal defense firm. The government claims Mr. Finch told federal agents that he always provides each of his students with a criminal defense attorney's business card. In contrast, Defendant's investigator reported that Mr. Finch provided the business card to Defendant when he shook his hand at the end of the class after Mr. Finch had encountered Agent Destito in the classroom and Agent Kivlehan in the parking lot. The latter version appears more consistent with the facts. It is undisputed that, in the course of his security guard training class, Mr. Finch explains to his students that they may at some point be questioned about their actions and may be accused of violating an individual's rights. He describes to his class an accused's constitutional rights, including that an accused may demand a lawyer and may refuse to speak to a law enforcement officer.

exited the building, two agents grabbed him by his arms and escorted him to a vehicle waiting in the parking lot. Defendant testified that one of the agents took Defendant's cell phone at this point. Defendant told the agents, "I don't have to talk to you," and asked if the agents had a warrant for him. *Id.* at 17:14; 95:12. He further claims that while being escorted by the agents, he took the Cobb & Cobb business card out of his front pocket, handed it to Agent Doud, and asked: "[M]ay I please speak to this lawyer?" *Id.* at 80:24-25; 81:14. He claims Agent Doud took the card from him, read it, and "with a grin he placed it into his pocket." *Id.* at 81:16-17. He further testified that he again said, "can I please speak to the lawyer," as he was being placed into the vehicle. *Id.* at 82:13-14.

Agent Kivlehan credibly testified that he and Agent Doud waited until Defendant left the building and then immediately grabbed his arms and told him he was under arrest. In response, Defendant said: "[W]hat am I under arrest, what's this, what's this all about[?]" (Tr. 1/8/14 at 15:15-16.) Defendant appeared "confused" and "started kind of mumbling a bunch of stuff and he stiffened up and he kind[] of[,] he wasn't um, fighting us in any way, he was, he was non-compliant, but he wasn't . . . trying to . . . be belligerent or anything like that. He was more I think nervous of what was going on." *Id.* at 15:16-21; 17:17. According to Agent Kivlehan, because Defendant had "recoiled or stiffened up," the agents "just grabbed both his arms pretty tight, held them. We were trying to get them around his back." *Id.* at 16:11-14. The agents then walked Defendant to the agents' vehicle and handcuffed him. At that point, Agent Kivlehan "was done with whatever [he] was doing and [he] went back to [his] car." *Id.* at 16:16-18. Agent Kivlehan did not actually participate in handcuffing Defendant but described the interaction which he watched as "relatively smooth the handcuff process and everything." *Id.* at 22:3-4.

According to Agent Kivlehan, during the escort to the vehicle, Defendant continued "mumbling a bunch of stuff" and some "incoherent things too." *Id.* at 15:16-17; 17:4-5, 9. Agent Kivlehan "wasn't really concerned too much about what the defendant had to say" because it "wasn't [his] case" and he did not "even know anything

about [the] case." *Id.* at 17:11-14. He did not hear Defendant make a statement about a lawyer. He estimated that the escort of Defendant to the vehicle took approximately ten to fifteen seconds and described this as the entirety of his interaction with Defendant. *Id.* at 20:10-12 ("Literally my interactions with him was 10 to 15 seconds. That was it. From [the] door to [the] car and I was gone."). During that time period, Agent Kivlehan did not hear Defendant invoke any constitutional rights or see Defendant present a business card for a lawyer.

Agent Doud testified that he and Agent Kivlehan approached Defendant as he exited the building and told him they were police officers who wanted to speak to him. According to Agent Doud, Defendant "immediately became confrontational and pulled away and became what [he] would describe as being abrasive and reluctant to have [a] conversation with us." (Tr. 2/27/14 at 16:12-14; *see also id.* at 20:4-5 for Agent Doud's description of Defendant as engaged in "boisterous[,] antagonistic, confrontational behavior."). Defendant told the agents they "had no right to do this" and that they did not have a warrant. *Id.* at 16:21-23. Agent Doud responded that they had a warrant for Defendant's arrest, and then he and Agent Kivlehan grabbed Defendant's arms. According to Agent Doud, Defendant "continued to resist [them] and pull and wriggle and squirm" as they escorted Defendant to the agents' vehicle. *Id.* at 17:2-5.

Agent Doud further testified that Defendant said: "[Y]ou can't do this, don't touch me, I don't have to talk to you, this is bullshit." *Id.* at 17:13-15. Agent Doud characterized Defendant's speech that day as difficult to understand, but he conceded that Defendant said the word "lawyer." *Id.* at 17:16-20; 18:3-6 ("I, I know that he said the word lawyer. And I do not know the rest of the phrase or sentence that surrounded that use of the word lawyer. But I do recall hearing him say the word lawyer."). As Defendant was escorted to the waiting vehicle, he "continued to stiffen up and resist against us," *id.* at 18:16-17, and so Agent Doud decided to handcuff Defendant behind his back. During this process, Defendant "stiffened up and became upright as if he was going to pull away." *Id.* at 19:4-6. Agent Doud told Defendant to stop resisting and to calm down and relax. He finished handcuffing Defendant and did a cursory search of his

person.  Agent Doud testified that he found and took Defendant's cell phone during this search.  In his report of the incident, Agent Doud describes Defendant's arrest as follows:

> S/A Doud said that the investigators wished to speak with [Defendant].  HERCULES immediately responded in an agitated, non-compliant, boisterous, and defiant manner.  S/A Doud then announced to HERCULES that the agents had an arrest warrant for him, and told him to place his hands behind his back.  HERCULES refused to do this, excitedly uttered several remarks, and tried to pull away from the agents' grasp.  As he attempted to quickly move away from the agents, the agents secured HERCULES by his arms (S/A Doud grasping the right arm and S/A Kivlehan grasping the left arm) and escorted him to the vehicle that Det. Trooper Casey Daniell, S/A Christopher Destito, and S/A Doud were utilizing on that date.  During this escort, HERCULES continued to protest what was happening, and continued to wriggle and struggle with his arms. He was taken alongside of this vehicle and S/A Doud began to handcuff him.  HERCULES immediately resisted the handcuffing attempt by stiffening his body upward and pulling away from S/A Doud's grasp.  S/A Doud told HERCULES to relax and stop resisting, and then finished handcuffing him.

Defendant's Ex. A at 2.

FBI Agent Destito witnessed Defendant being escorted to the vehicle, but he could not hear anything either Defendant or the agents were saying.  At the vehicle, he heard Agent Doud tell Defendant to "stay still" as he patted him down and that "we'd be going, we'd be getting in the vehicle and going down the road, [and] we could talk further at that time."  (Tr. 1/8/14 at 55:1-4.)  He credibly testified that he did not hear Defendant make a statement about a lawyer.

VSP Detective Daniell watched Agents Doud and Kivlehan "walk up to [Defendant] on each side of him.  [He] could see [Defendant] kind of tense up.  They had grabbed onto his arms and walked him back towards Agent Destito's vehicle."  *Id.* at 85:20-23.  He could hear the agents and Defendant speaking, but he could not make out what they were saying.  He did not hear Defendant make a statement about a lawyer or otherwise attempt to invoke his right to counsel.  He described Defendant as appearing "upset at the time" and "physically . . . tense," and Detective Daniell noted, "I want to say that he was saying something to the two agents but I, I don't remember exactly for sure if

he was." *Id*. at 86:13-17. He remembered seeing Defendant handcuffed behind his back, but he did not recall him being patted down. While Defendant was being handcuffed, Detective Daniell testified that he recalled Defendant "was talking," but he could not recall what he said. *Id*. at 88:12-13. Detective Daniell testified that the agents, while in the vehicle, identified themselves and told Defendant they had an arrest warrant for him.

In the face of these conflicting accounts, the court must make several credibility determinations. In doing so, it notes that Agent Doud's report, which is not under oath, describes Defendant's conduct during the arrest in a manner inconsistent with the accounts of the other agents who watched it take place. Although all of the agents saw Defendant physically tense, he did not repeatedly pull away from Agents Doud and Kivlehan or attempt to free himself from their tight grasp. The report fails to mention Defendant's statement about a "lawyer," although in his report, Agent Doud states: "It is noted that during the arrest of [Defendant], and the initial explanation by S/A Doud of what was occurring and why it was occurring, [Defendant] engaged in two attorney-related gestures. The investigators did not interpret these ambivalent actions as constituting an invocation of [Fifth] or [Sixth] Amendment rights." Defendant's Ex. A at 8. However, Agent Doud never consulted with the other agents regarding Defendant's statement about a "lawyer" or the Cobb & Cobb business card prior to writing his report.

Defendant, in turn, inaccurately testified that he presented Agent Doud with the Cobb & Cobb business card in the process of his arrest. As Defendant was restrained at the time by two agents, it is unlikely that he would have been allowed to pull anything out of his pocket without being taken to the ground or otherwise incapacitated. None of the agents who witnessed the arrest saw Defendant take anything out of his pocket. Agent Doud testified that Defendant presented him with the Cobb & Cobb business card during questioning in the vehicle. The other agents present in the vehicle corroborated this claim when they testified that, in the course of the questioning in the vehicle, they either heard or saw Agent Doud exclaim as Defendant reached for his front pocket and retrieved something. Agent Doud's report accurately documents this event taking place "[a] few minutes after the arrest." Defendant's Ex. A at 9.

8

The crux of the court's credibility determinations is thus whether in the course of his arrest, Defendant told Agent Doud that he wanted to speak to a lawyer. The court finds that he did so, but in a manner that was not clearly intelligible to the agents that surrounded him. The court bases this credibility determination on the following facts. Defendant made this statement after having been instructed by Mr. Finch regarding the rights to invoke when arrested. He did so at a time when he was both upset and confused and immediately after he had been grabbed by two agents dressed in plain clothes who were forcing him to walk towards additional agents in plain clothes and a waiting vehicle. The court finds Agent Kivlehan's testimony credible that Defendant's statements were "mumbled" and "incoherent" and that he did not hear Defendant request a lawyer or otherwise invoke a constitutional right.

In turn, Agent Destito and Detective Daniell credibly testified that although Defendant appeared to be talking with Agent Doud, they could not understand what either of them was saying and did not hear Defendant make a statement about a lawyer or otherwise attempt to invoke his right to counsel. In the course of the agents' interview with Defendant, Agent Destito credibly testified that Defendant "was very soft spoken. There [were] numerous times where we had to ask him to speak up." (Tr. 1/8/14 at 61:21-23.) Agent Doud credibly described Defendant's demeanor during this subsequent interview as "quiet, reticent," and "demoralized." (Tr. 2/27/14 at 37:17, 24.) He credibly testified that he "had difficulty understanding [Defendant] throughout that entire day. The way he spoke, the way his tone was low, he mumbled his words. My entire interaction with him that day was often speckled with having to ask him at least once, if not twice, to repeat himself." *Id.* at 17:16-20.

On balance, the court finds that Agent Doud heard enough of Defendant's statement to discern that he was making a statement about a lawyer, but he either did not hear or could not understand the remainder of Defendant's statement. Agent Doud's decision not to advise any of his fellow agents regarding Defendant's statement about a lawyer, his decision not to document it clearly in his report, and his decision to refrain from telling his fellow agents that Defendant had presented him with a business card for a

criminal defense law firm underscore the court's further conclusion that Agent Doud made no effort to discern whether Defendant was invoking a constitutional right.

Thereafter, when the agents parked their vehicle in a nearby grocery store parking lot, Defendant gave Agent Doud the business card for the Cobb & Cobb law firm. The witnesses' versions of this event differ, although not materially. Agent Destito, who was in the driver's seat facing the windshield, heard Agent Doud exclaim, and Agent Destito turned around and saw Defendant taking something from his right front pocket and Agent Doud reaching for Defendant's hands. He saw Agent Doud take a business card from Defendant's hands and ask, "[W]hat is this[?] It's a business card," (Tr. 1/8/14 at 78:1-2), to which Defendant did not respond. Agent Doud took the card and "[c]ontinued his . . . dialogue with [Defendant.]" *Id.* at 64:13-25; 65:7-11. He did not ask Defendant any other questions about the card.

Detective Daniell, who was seated in the front passenger seat, testified that he heard a "commotion" in the back and saw Agent Doud reaching towards Defendant who appeared to have his hand in his pocket. *Id.* at 93:25-94:3. He does not recall any statements being made by either Defendant or Agent Doud, and he did not actually see anything being removed from Defendant's pocket. He did not hear Agent Doud ask Defendant any questions about the card. The first time he heard that Defendant had given Agent Doud a business card for a criminal defense attorney was when Defendant filed his motion to suppress.

Agent Doud testified that at the beginning of his discussion with Defendant, Defendant reached into his left front pocket and extracted a business card as Agent Doud reached over to restrain his hands. He credibly described Defendant as exhibiting considerable flexibility that day despite being handcuffed in the back. Agent Doud asked Defendant what the item was and Defendant told him it was a card. Agent Doud took the card, looked at it, and saw that it was a business card for a law firm in New York. Upon Defendant's production of the card, Agent Doud "reminded [Defendant and] asked that he listen to everything that [Agent Doud] was going to explain and then [Defendant] would be in a better position to make a decision knowing all of the information that was

10

surrounding why [the agents] were there and why this situation was occurring." (Tr. 2/27/14 at 31:16-20.) The court has rejected as incredible Defendant's testimony that he presented the Cobb & Cobb card to Agent Doud in the course of his arrest.

After weighing the competing evidence, the court concludes that Defendant extracted the Cobb & Cobb card from one of his front pants' pockets while seated in the vehicle and cuffed behind his back. He handed the card to Agent Doud, who did not ask him any questions about it but, instead, continued to talk to Defendant.

Thereafter, Agent Doud advised Defendant of the indictment against him, the status of the agents' investigation, the evidence against Defendant, the agents' areas of investigative interest, and the benefits of cooperation. Detective Daniell credibly testified that Agent Doud "explained to [Defendant] in great detail the investigation from where it had originated to where [the agents] were at that point with [Defendant]." (Tr. 1/8/14 at 90:3-6.) Agent Doud told Defendant that he would advise him of his constitutional rights because he was in custody and explained that the agents were hoping to have a productive conversation with him in order to enable them to go into the Bronx and go after higher level suppliers.

Agent Doud provided Defendant with *Miranda* warnings before asking Defendant any specific questions.[2] Defendant nodded in response to Agent Doud's inquiry regarding whether Defendant understood his *Miranda* rights, and Defendant further credibly testified that he did in fact "understand" them. (Tr. 2/27/14 at 103:18-104:1.) When asked whether he would be willing to speak to the agents, Defendant responded "I can try" and in doing so he testified that he sought to convey to the agents that he was willing to speak to them if he was able to answer their questions. *Id.* at 104:12. None of the agents was present for the entirety of the interview with Defendant.

In the course of the interview, Detective Daniell asked to look at Defendant's cell phone, and Defendant agreed that he could do so. Detective Daniell did not advise

---

[2] Defendant testified that the agents questioned him before administering *Miranda* warnings, but the court does not find his testimony on this point credible. The other agents in the vehicle each credibly testified that Agent Doud engaged in a lengthy monologue before advising Defendant of his *Miranda* rights and asking Defendant questions.

Defendant that he could refuse to consent.  Defendant provided the password for the phone in response to Detective Daniell's request, and Detective Daniell briefly reviewed some of the contents of the phone, including its contacts list.  Defendant concedes that he was not threatened or forced to consent to the search and that he did so "freely."  (Tr. 2/27/14 at 106:12-107:13.)  Detective Daniell asked Defendant a few questions about the phone's contacts, including why Defendant had a phone number for "Checka," a suspected heroin supplier in the Bronx, if he did not know her as he claimed.

The interview in the vehicle lasted approximately one hour and took place in a calm, cooperative, and conversational tone.  Defendant told the agents that he could not assist them in going after sources of supply in the Bronx.  In the course of the interview, Defendant made no further statements about a lawyer and did not invoke his right to silence.

## II.    Conclusions of Law and Analysis.

### A.    Burden of Proof.

"It is well established that the burden of production and persuasion generally rest upon the movant in a suppression hearing."  *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (internal quotation marks omitted).  "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."  *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

If the government contends that a defendant voluntarily and knowingly waived his or her *Miranda* rights, then the government must "prove waiver . . . by a preponderance of the evidence."  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *see also United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012) ("The Government bears the burden of proving by a preponderance of evidence that a valid waiver occurred.").  Similarly, "when, as in this case, the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary."  *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

**B.      Whether Defendant Invoked His Right to Remain Silent.**

Defendant seeks suppression on the ground that he invoked his right to remain silent when he told the agents who arrested him, "I don't have to talk to you." (Doc. 129.) The government contends that Defendant's statement was not an unambiguous and unequivocal invocation of his right to remain silent because, while it was "an accurate statement about his right," it was "not a clear statement that he was invoking that right."[3] (Doc. 137 at 6.)

A defendant seeking to invoke his right to remain silent under the Fifth Amendment "'must do so through a clear, unambiguous affirmative action or statement.'" *United States v. Oehne*, 698 F.3d 119, 123 (2d Cir. 2012) (quoting *United States v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011)). "A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (holding that a suspect "who wants to invoke his or her right to remain silent [must] do so unambiguously").

In this case, Defendant "did not say that he wanted to remain silent or that he did not want to talk with the police," which "would have invoked his right to cut off questioning." *Berghuis*, 560 U.S. at 382. Defendant, instead, stated, "I don't have to talk to you." While this statement indicates Defendant's knowledge of his right to remain silent, it does not "indicate[] that 'he wishe[d] to remain silent'" at that time. *Michigan v. Mosley*, 423 U.S. 96, 101 (1975) (quoting *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966)). Defendant's statement that "I don't have to talk to you" is analogous to a suspect's repeated statement that "I'm not going to talk about nothin'," which the Seventh Circuit determined was ambiguous and "as much a taunt—even a provocation—

---

[3] The government initially argues that Defendant has not proven that he was in custody at the time he made this statement; however, Defendant was told by the agents that he was under arrest and was grabbed by both arms by the two agents prior to making the contested statement. There is thus no reasonable dispute that Defendant was in custody. *See United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004) (directing that the "'ultimate inquiry' for determining *Miranda* custody . . . [is] 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest'") (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)).

as it is an invocation of the right to remain silent." *United States v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006); *see also United States v. Plugh*, 648 F.3d 118, 125-26 (2d Cir. 2011) (concluding suspect's conduct and statements "made . . . clear he was . . . not seeking to invoke his rights and thus cut off all further questioning at that point" when his statements that included, "I am not sure if I should be talking to you," were ambiguous and "bespoke indecision"); *Burket v. Angelone*, 208 F.3d 172, 200 (4th Cir. 2000) (concluding statements did not "constitute an unequivocal request to remain silent" when suspect stated, "I just don't think that I should say anything" and "I need somebody that I can talk to"). Viewed objectively, Defendant's statement that "I don't have to talk to you" was both ambiguous and equivocal regarding whether he wanted to exercise his right to remain silent. *See Berghuis*, 560 U.S. at 381-82.

Because Defendant's statement to law enforcement was not an unambiguous and unequivocal invocation of his right to remain silent, the agents did not violate Defendant's constitutional rights by proceeding to interrogate him thereafter. Defendant's motion to suppress on the ground that his constitutional right to remain silent was violated is therefore DENIED.

### C.    Whether Defendant Invoked His Right to Counsel.

Defendant seeks suppression of his statements on the further ground that he allegedly unequivocally and unambiguously invoked his right to counsel after he was taken into custody. He contends that the agents should not have "ignore[d] the circumstances surrounding the use of the word 'lawyer,'" but rather should have taken "steps to ensure" they understood what he was trying to communicate through his statements and gestures. (Doc. 130 at 6, 7.) He maintains that a law enforcement officer who does not hear what a suspect is saying, except for the word "lawyer," should be required to ask the suspect to repeat his statement. Defendant cites no authority for this proposition, and the court has found none.

A "suspect must unambiguously request counsel," which requires the suspect to "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an

attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994); *see also Moran v. Burbine*, 475 U.S. 412, 434 (1986) ("[A]s both *Miranda* and subsequent decisions construing *Miranda* make clear beyond refute, the interrogation must cease until an attorney is present *only* [i]f the individual states that he wants an attorney.") (internal quotation marks omitted) (second alternation in original).

Here, Defendant requested to speak to a lawyer, but he did so in a manner that was unintelligible except for the word "lawyer." Although the better practice[4] may have been for Agent Doud to ask Defendant to repeat the statement, he was not required to do so. *See Davis*, 512 U.S. at 461-62 (observing that, while it would have been "good police practice for the interviewing officers to clarify whether or not a defendant actually want[ed] an attorney," there is no "rule requiring officers to ask clarifying questions"). To the contrary, it is well established that, "[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis*, 560 U.S. at 381 (quoting *Davis*, 560 U.S. at 459, 461-62).[5] Accordingly, the court concludes Agent Doud had no

---

[4] The "better practice" is not without its shortcomings. If a law enforcement officer directs a suspect who is mumbling to himself or herself to speak louder so that the officer may hear, this has the potential to convey to a suspect the erroneous impression that law enforcement may compel a suspect to speak. This, in turn, may interfere with the suspect's right to remain silent.

[5] "Statements such as: 'Maybe I should talk to a lawyer,' *Davis v. United States*, 512 U.S. 452, 462 (1994) (internal quotation marks omitted); 'Do you think I need a lawyer?' *Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir. 1996); and a suspect's statement that he 'was going to get a lawyer,' *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990), have been found to be insufficient to constitute an unambiguous request for counsel." *United States v. Oehne*, 698 F.3d 119, 123 (2d Cir. 2012); *cf. Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011) (addressing whether suspect invoked right to counsel when suspect stated, "I think I should get a lawyer," and concluding suspect invoked right because the statement "evidence[d] no internal debate whatsoever" and the "language was unambiguous: he did not say '*perhaps* I should get a lawyer' or '*maybe* I need a lawyer'"); *Smith v. Illinois*, 469 U.S. 91, 96 (1984) (concluding defendant's statement "I'd like to do that," upon learning that he had the right to counsel's presence, was neither indecisive nor ambiguous and so was a clear and unequivocal invocation of the right to counsel).

obligation to ask Defendant to repeat his statement with the word "lawyer" so that it was intelligible.

Defendant's provision of the Cobb & Cobb business card to Agent Doud in the agents' vehicle was also ambiguous. Although Agent Doud did not ask if Defendant wanted to contact the attorney on the card, thereafter, he reminded Defendant "to listen to everything he had to say," which included an accurate recitation of Defendant's *Miranda* rights. Defendant did not tell Agent Doud that he wanted to speak to a lawyer even when he was reminded that he had the right to do so and to have an attorney present during questioning.

The courts have held that, without more, a suspect's reference to his or her lawyer, unaccompanied by any statement indicating a present intent or desire to speak with a lawyer, is insufficient to invoke the right to counsel. *See Oehne*, 698 F.3d at 123 (concluding that "merely inform[ing] the officers that [suspect] had a lawyer for an unrelated charge" was an ambiguous invocation of the right to counsel, particularly when suspect never "even tentatively" requested a lawyer regarding the pending charge); *Delap v. Dugger*, 890 F.2d 285, 294 (11th Cir. 1989) ("[T]he mere indication that [the defendant] was represented by counsel in an unrelated matter does not constitute even an equivocal request for counsel."); *see also United States v. Touzel*, 409 F. Supp. 2d 511, 525 (D. Vt. 2006), *aff'd*, 281 F. App'x 37 (2d Cir. 2008) (concluding that asking officer "if there would be legal representation in Burlington" failed "to qualify as an unambiguous request for counsel"). Defendant's presentation of a lawyer's business card, unaccompanied by a coherent request to speak to a lawyer, does not alter this conclusion. *See United States v. Ivanson*, 2007 WL 680782, at *4-6 (E.D.N.Y. Mar. 2, 2007) (concluding defendant never unambiguously and unequivocally invoked his right to counsel, even though defendant gave interrogating officer two business cards for two retained lawyers and even though he later called those two lawyers while in custody and in the presence of the interrogating officer, because defendant's gestures were not sufficiently clear to indicate to the interrogating officer his present desire to request counsel); *Thompson v. Fischer*, 2003 WL 23198787, at *15-16 (E.D.N.Y. Oct. 31, 2003)

(denying habeas challenge alleging right to counsel violated because, although defendant "produced" a business card for a lawyer, he never asked to call that lawyer or otherwise state he wanted a lawyer).

In this case, the agents were faced with Defendant's ambiguous request for counsel, in the face of such a request, the agents had no duty to seek clarification from Defendant regarding his intent and "the [agents had] no obligation to stop questioning him." *Davis*, 560 U.S. at 459. Defendant's motion to suppress his statements on the basis that his right to counsel was violated is therefore DENIED.

### D.    Whether Defendant Validly Waived His *Miranda* Rights.

Defendant seeks to suppress his statements on the ground that he did not knowingly and voluntarily waive his *Miranda* rights. He asserts that he agreed to speak with the agents only after the agents ignored his attempts to invoke his right to remain silent and his right to counsel, thereby forcing him to "g[i]ve up . . . as [Agent] Doud hoped he would." (Doc. 130 at 6.) Defendant further argues that the agents knew, based on his attempts to invoke his rights, that he was "reluctant" to speak to them and that thereafter Agent Doud "set out to change Defendant's frame of mind" by making "veiled threats," confronting him with incriminating evidence, and informing him that the prosecutor could reduce or dismiss the charges against him if he cooperated. *Id.* at 5.

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis*, 560 U.S. at 382-83 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). The waiver of *Miranda* rights must be both "'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception'" and knowing in the sense that it was "'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis*, 560 U.S. at 382-83 (quoting *Burbine*, 475 U.S. at 421).

17

In determining the validity of a *Miranda* waiver, courts do not inquire into the subjective intentions of law enforcement unless those intentions are disclosed to the suspect. *See Moran*, 475 U.S. at 421-423 (ruling that "the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of [defendant's] election to abandon his rights . . . unless he were at least aware of the incident"). Instead, the "inquiry into the knowing and voluntariness of a waiver is 'directed to a defendant's state of mind, which can be inferred from his actions and statements.'" *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 211 (2d Cir. 2008) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993)).

In this case, Agent Doud provided Defendant with *Miranda* warnings before asking Defendant any specific questions. Although Agent Doud engaged in a lengthy monologue in which he reviewed the investigation concerning the Flow heroin and the investigation's status, the evidence against Defendant, and the benefits of cooperation, "courts have generally rejected claims . . . that disclosure of . . . inculpatory evidence possessed by the police, without more, constitutes 'interrogation.'" *Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009); *see also Easley v. Frey*, 433 F.3d 969, 974 (7th Cir. 2006) (holding that state court did not act unreasonably in rejecting claim that officer's "matter-of-fact communication of the evidence against [defendant] and the potential punishment he faced" constituted interrogation); *Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir. 1995) (holding that incriminating statements were not result of interrogation where "the police identif[ied] the victim to the suspect and briefly stat[ed] the evidence against him"); *but cf. United States v. Szymaniak*, 934 F.2d 434, 436-37, 439 (2d Cir. 1991) (holding that interrogation occurred where officer visited defendant "three or four times" to confront him with inculpatory information and "request[ed] that he give [the police] a statement").

Defendant was not only apprised of his *Miranda* rights prior to questioning, but he credibly testified that he understood those rights. Indeed, Defendant demonstrated his knowledge of at least one of his *Miranda* rights upon his arrest when he told the agents: "I don't have to talk to you." *See Pickens v. Gibson*, 206 F.3d 988, 995 (10th Cir. 2000)

(noting defendant's conduct prior to waiver indicated that he understood the nature and consequences of his right to remain silent and his right to counsel). This was consistent with the information Mr. Finch had provided to Defendant and his other students which included a discussion of a suspect's constitutional rights. After receiving *Miranda* rights, Defendant indicated his willingness to waive them and attempt to answer the agents' questions. An "oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *Butler*, 441 U.S. at 373.

As for Defendant's claim that his *Miranda* waiver was nonetheless involuntary, the government bears the burden of proving the waiver was "'the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Berghuis*, 560 U.S. at 382-83 (quoting *Burbine*, 475 U.S. at 421). The "voluntariness of a waiver" of a suspect's *Miranda* rights "has always depended on the absence of police overreaching." *Connelly*, 479 U.S. at 170. The court must consider the totality of circumstances, "including the background, experience, and conduct of the accused" to determine whether a defendant's waiver was voluntary. *Butler*, 441 U.S. at 374-75 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *see also Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003) (instructing the court to consider "(1) the accused's characteristics, (2) the conditions of the interrogation, and (3) the conduct of the police").

At the time of his *Miranda* waiver, Defendant was an adult with a high school education who was pursuing certification as a security guard. While Defendant had never been previously provided with *Miranda* warnings or interrogated, he had some experience with the criminal justice system due to his prior arrest and incarceration. *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (recognizing that "there is no indication in this record that [defendant] was a 'newcomer to the law,'" when determining defendant knowingly and voluntarily waived his *Miranda* rights) (quoting *United States v. Watson*, 423 U.S. 411, 424-25 (1976)).

Defendant was apparently not under the influence of any intoxicants or narcotics, and although he was upset during his initial encounter with the agents, the interview in the vehicle proceeded in a calm and cooperative manner. Defendant was handcuffed at

19

the time of the waiver, but he makes no claims that he was threatened or physically mistreated by the agents. Throughout the interview, Defendant freely denied knowing certain information and told the agents he could not assist them in locating the sources of supply in the Bronx. This supports a conclusion that Defendant's will was not overborne. *See United States v. Vilar*, 141 F.3d 1152, at *112 (2d Cir. Mar. 9, 1998) (finding accused's will was not overborne because he refused to admit that he shot a police officer despite making other incriminating statements); *see also United States v. Wilbon*, 309 F. App'x 27, 30 (7th Cir. 2009) (noting that the accused "show[ed] independent thinking and free will" because he "refused to provide a written statement during the interrogation and denied his involvement in other robberies").

Agent Doud discussed the benefits of cooperation with Defendant before securing a *Miranda* waiver, however, courts have held this does not render a waiver involuntary provided there is no deceit, trickery, or false promise of immunity. *See United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989) (noting law enforcement officers are "free to discuss with [a defendant] the evidence against him and the reasons why he should cooperate"); *see also United States v. Bye*, 919 F.2d 6, 10 (2d Cir. 1990) (determining that promises of leniency do not necessarily "convert[] an otherwise proper encounter between the police and the accused into a coercive and overbearing experience"). As the Second Circuit has explained, "[a]n indication by the arresting officers to the defendant that his cooperation will help him is only one factor to consider in determining whether the defendant's waiver was given voluntarily. There is no inconsistency between the required warning that the defendant's statement may be used against him and a further statement that cooperation can help him. Both are true." *Jaswal*, 47 F.3d at 542. Agent Doud's discussion of the possible "penalties" Defendant faced likewise was not coercive. *See United States v. Pomares*, 499 F.2d 1220, 1221 (2d Cir. 1974) (finding law enforcement properly told defendant that he faced "heavy penalties" and "that the wisest course of action would be to cooperate with the government").

Based on the totality of the circumstances, the government has sustained its burden of proving that Defendant understood his *Miranda* rights and that his waiver of

those rights was both knowing and voluntary and secured in the absence of police misconduct.  The court therefore DENIES the motion to suppress Defendant's statements on the ground that his *Miranda* waiver was not voluntary.

### E.       Whether Defendant Consented to a Search of His Cell Phone.

Defendant seeks to suppress any evidence derived from a warrantless search of his cell phone conducted by Detective Daniell during the interview in the vehicle.  He contends that his consent to the search was not voluntary.

"Although warrantless searches of private property are generally presumed to be unreasonable, the law recognizes certain exceptions, for example, when the search is conducted pursuant to the consent of an authorized person." *Snype*, 441 F.3d at 130. However, consent cannot "be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 228 (1973).  The government has the burden of proving that consent to conduct a search was freely and voluntarily given.  *See United States v. Vasquez*, 638 F.2d 507, 524 (2d Cir. 1980).  "The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of authority." *United States v. Moreno*, 701 F.3d 64, 76 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2797 (2013) (internal quotation marks and citations omitted).  "Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 227).

In examining the totality of all the circumstances, a court should weigh "the characteristics of the accused and the details of the interrogation," including the following factors: the age, education, and intelligence of the accused; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth*, 412 U.S. at 226.  Other factors include "whether there was a show of force [and] whether the agents told the defendant that a search warrant would be obtained." *United States v. Munoz*, 2013 WL 6638922, at *4

(S.D.N.Y. Dec. 18, 2013) (internal quotation marks, citations, footnotes, and alterations omitted).

Here, as previously noted, Defendant is an adult male, with a high school education, some employment history, and some experience with the criminal justice system. Defendant was advised of his *Miranda* rights, however, he was not informed of his right to refuse consent to Detective Daniell's request to search his phone. While "such knowledge [is] highly relevant to the determination that there had been consent," the "Constitution does not require 'proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search.'" *United States v. Mendenhall*, 446 U.S. 544, 558-59 (1980) (quoting *Schneckloth*, 412 U.S. at 234). Rather, "knowledge of the right to refuse consent is only one factor in the analysis." *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990); *see also United States v. Garcia*, 56 F.3d 418, 422-23 (2d Cir. 1995) (noting "knowledge of the right to refuse consent" is a "factor" in determining whether consent was voluntary).

Defendant was handcuffed and in custody before and at the time he gave consent. However, the Second Circuit has "repeatedly observed that neither the fact that a person is in custody nor that [he or] she has been subjected to a display of force rules out a finding of voluntariness." *Moreno*, 701 F.3d at 77; *see also Snype*, 441 F.3d at 131 ("[T]he fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness[.]");*United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) (holding that use of guns to effectuate arrest and handcuffing of defendant did not render his consent to search his home involuntary).

Defendant was calm when Detective Daniell asked for his consent and he credibly testified that he did not feel threatened or forced to consent but that he did so "freely." (Tr. 2/27/14 at 106-07); *see also Moreno*, 701 F.3d at 77 (finding consent voluntary, the Second Circuit noted it was "undisputed" the defendant was "calm when agents asked her consent to search," which followed their forcible entry into her motel room); *see also Snype*, 441 F.3d at 131 (concluding consent voluntary, despite forcible entry into home

by a heavily armed SWAT team that secured occupants in handcuffs, because the entry occurred before defendant's consent and because she had time to calm down).

"[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *Isiofia*, 370 F.3d at 231 (quoting *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)); *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). In this case, it was objectively reasonable for Detective Daniell to believe that Defendant had provided consent to search his phone when he agreed that Detective Daniell could search it and provided the password to enable him to do so. The court thus DENIES Defendant's motion to suppress the physical evidence derived from the cell phone search.[6]

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's Motion to Suppress Statements (Doc. 78) and DENIES Defendant's Supplemental Motion to Suppress Evidence and Statements (Doc. 80).

SO ORDERED.

Dated at Rutland, in the District of Vermont, this _17th_ day of April, 2014.

Christina Reiss, Chief Judge
United States District Court

---

[6] Because the court finds that Defendant voluntarily consented to the search, the court does not address whether the warrantless search of Defendant's cell phone would also have been justified as a search incident to arrest.

23